UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
SS GROCERY, INC. and ABU NUMAN,

               Plaintiffs,

        -against-

U.S. DEPARTMENT OF AGRICULTURE, FOOD
AND NUTRITION SERVICE,

               Defendant.
-------------------------------------------------------------x

**MEMORANDUM & ORDER**
16-cv-03966 (LDH) (CLP)

LASHANN DEARCY HALL, United States District Judge:

Plaintiffs SS Grocery, Inc. and Abu Numan bring this action against Defendant U.S.

Department of Agriculture, Food and Nutrition Service ("FNS") seeking judicial review—under

7 § U.S.C. 2023(a)(13) and § 7 CFR 279.7—of FNS' decision to disqualify Plaintiffs from

participating in the Supplemental Nutrition Assistance Program ("SNAP"). Specifically,

Plaintiffs contend that FNS' determination that Plaintiffs had engaged in trafficking was invalid.

Plaintiffs move, pursuant to Federal Rule of Civil Procedure 56, for summary judgment to vacate

FNS' decision. Defendant cross-moves, pursuant to Rule 56, for summary judgment to dismiss

the action in its entirety.

**BACKGROUND**

I. **Statutory and Regulatory Regime**

Upon a finding, *inter alia*, that "the limited food purchasing power of low-income

households contributes to hunger and malnutrition among members of such households,"

Congress created SNAP, which "permit[s] low-income households to obtain a more nutritious

diet through normal channels of trade by increasing food purchasing power for all eligible

households who apply for participation." 7 U.S.C.A. § 2011. Pursuant to the Food Stamp Act,

FNS, as an agency operating under the United States Department of Agriculture (the "USDA"),

administers SNAP.  (Defendant's Reply 56.1 Statement ("Def.'s Reply 56.1") ¶ 3, ECF No. 26.)

Through SNAP, eligible low-income households receive electronic benefit transfer ("EBT") cards

that facilitate the purchase of food.  7 U.S.C.A. § 2016(a)–(b).  The EBT cards are credited with

an allotment based on "the total value of benefits a household is authorized to receive during each

month."  7 U.S.C.A. § 2012.  Eligible households may then use the allotment at authorized retail

stores in exchange for eligible food and for cash under conditions not relevant in the instant

action.  7 C.F.R. § 278.2(a).  SNAP regulations prohibit trafficking, which is the "buying, selling,

stealing, or otherwise effecting an exchange of SNAP benefits . . . for cash or consideration other

than eligible food."  7 C.F.R. § 271.2.

The default penalty for a retail store found to have engaged in trafficking is permanent

disqualification from the SNAP program.  7 C.F.R. § 278.6(e)(1)(i).  Alternatively, "FNS may

impose a civil money penalty in lieu of a permanent disqualification for trafficking . . . if the firm

timely submits to FNS substantial evidence which demonstrates that the firm had established and

implemented an effective compliance policy and program to prevent violations of the Program."

7 C.F.R. § 278.6(i).  That is, a retail store must, "at a minimum," submit substantial evidence,

which demonstrates that the store meets the following criteria:

> Criterion 1.  The firm shall have developed an effective compliance policy . . .; and
>
> Criterion 2.  The firm shall establish that both its compliance policy and program were in operation at the location where the violation(s) occurred prior to the occurrence of violations cited in the charge letter sent to the firm; and
>
> Criterion 3.  The firm had developed and instituted an effective personnel training program . . .; and
>
> Criterion 4.  Firm ownership was not aware of, did not approve, did not benefit from, or was not in any way involved in the conduct or approval of trafficking violations; or it is only the first occasion in which a member of firm management was aware of, approved, benefited from, or was involved in the conduct of any trafficking violations by the firm.

7 C.F.R. § 278.6(i).

Prior to assessing any penalty, a retail store suspected of trafficking is sent a charge letter, specifying "the violations or actions which FNS believes constitute a basis for disqualification or imposition of a civil money penalty." 7 C.F.R. § 278.6(b)(1). In response, a retail store "shall set forth a statement of evidence, information, or explanation concerning the specified violations or acts," *id.*, and notify FNS whether it "desires FNS to consider the sanction of a civil money penalty in lieu of permanent disqualification," 7 C.F.R. § 278.6(b)(2)(i). A retail store that receives an unfavorable determination from the FNS regional office is permitted to file an appeal to the Administrative Review Division. 7 C.F.R. § 279.1. The Administrative Review Division's determination shall be the final determination of FNS, subject to review only by a district court. 7 C.F.R. § 279.1(b).

## II.   Instant Action

### a.   Investigation of Plaintiffs

Plaintiff Numan serves as the President and Owner of Plaintiff SS Grocery, Inc., a grocery store located at 3703 73rd Street in Jackson Heights, New York. (A.R. 3, 276, 351[1]; Def.'s Reply 56.1 ¶ 1.) In December 2010, the USDA approved SS Grocery's application to participate in SNAP. (Def.'s Reply 56.1 ¶ 2.) SS Grocery's participation was suspended beginning in 2012, when FNS disqualified SS Grocery for a six-month period for selling ineligible food items. (A.R. 179; Def.'s Reply 56.1 ¶ 16.) In March 2013, after seeking judicial review, SS Grocery entered into a settlement with FNS pursuant to which it paid a monetary penalty of $19,140 in lieu of the six-month disqualification. (A.R. 164; Def.'s Reply 56.1 ¶ 16.) SS Grocery was reinstated as an

---

[1] Citations to "A.R." refer to the certified copy of the administrative record of proceedings filed by FNS as part of its motion for summary judgment. (ECF No. 35.)

authorized SNAP retailer that same year.  (A.R. 179.)  By 2015, FNS had observed SS Grocery

engaging in additional suspicious activity.  (A.R. 161–78.)

In January 2016, the FNS Investigative Analysis Branch ("IAB") issued a report on SS

Grocery's suspicious activity, finding "clear and repetitive patterns of unusual, irregular, and

inexplicable SNAP activity" and recommending that a trafficking charge letter be issued to

Numan and SS Grocery.  (*Id.*)  The IAB cited three categories of evidence supporting is findings.

*First*, an analysis of EBT transaction data for the review period, July 2015 to December 2015,

revealed irregularities in four different respects.  (A.R. 166–71.)  *Second*, observations made and

photographs taken during an August 2015 site visit conducted by an FNS reviewer.  (A.R. 85–86,

164, 90–129, 364.)  The site visit notes were used to ascertain whether there was a justification

for the irregularities identified during the review period.  (A.R. 166–71.)  For example, the

reviewer observed that the store lacked shopping carts for customer use and optical scanners to

facilitate purchase transactions, which suggested that the numerous high-dollar transactions were

illegitimate and indicative of trafficking.  (A.R. 85, 164, 168; *see also* Def.'s Reply 56.1 ¶ 30.)

*Third*, comparison data from other grocery stores within .15 miles of SS Grocery.  (A.R. 173–76.)

During the review period, the comparable stores had SNAP redemptions much lower than SS

Grocery's redemptions.  (*Id.*; *see also* Def.'s Reply 56.1 ¶ 53.)

  b.  FNS Charge Letter to Plaintiffs

On January 29, 2016, FNS sent Plaintiffs a letter charging the store with trafficking "as

defined in Section 217.2 of the SNAP regulations."  (Def.'s Reply 56.1 ¶ 17; A.R. 230.)

Although the letter did not specify which of the six subsections of 7 C.F.R. § 271.2 Plaintiffs

allegedly violated, (Plaintiffs' Reply 56.1 Statement ("Pls.' Reply 56.1") ¶ 3, ECF No. 27.), it

concluded that an analysis of SS Grocery's EBT transactions from July 2015 to December 2015

"establish[ed] clear and repetitive patterns of unusual, irregular, and inexplicable activity" for a

retail store like SS Grocery, (A.R. 230.). Attached to the letter was a list of 1,444 irregular

transactions identified by FNS for the July 2015 to December 2015 period. (A.R. 233–71; *see*

*also* Def.'s Reply 56.1 ¶ 21.) The transactions were divided into four categories evincing

trafficking: (1) "an unusual number of transactions [that] end[ed] in a same cents value"; (2)

"multiple transactions [that] were made from individual benefit accounts in unusually short time

frames"; (3) "the majority or all of individual recipient benefits [that] were exhausted in

unusually short periods of time"; and (4) "excessively large purchase transactions [that] were

made from recipient accounts." (A.R. 230; *see also* Pls.' Reply 56.1 ¶¶ 9–10, 15.)

FNS advised Plaintiffs that upon a determination that SS Grocery committed trafficking,

the retail store would be permanently disqualified from SNAP. (A.R. 230.) FNS also advised

Plaintiffs that it may alternatively receive a civil money penalty of up to $59,000 if Plaintiffs'

response requested such a penalty and satisfied the conditions set forth in 7 C.F.R. § 278.6(i).

(*Id.*) Finally, FNS' letter warned that the absence of a sufficient request for a civil money penalty

together with a trafficking finding would result in SS Grocery's permanent disqualification from

the program. (A.R. 231.)

        c.   Plaintiffs' Response to Charge Letter

On March 10, 2016, Plaintiffs, through their attorney, responded to FNS' charge letter.

(Defs.' Reply 56.1 ¶ 54.) The response included only the attorney's letter and four sworn

affidavits; it did not include a request for a civil money penalty. (*Id.* ¶ 60.) In the first sworn

affidavit, Plaintiff Numan denied that he or SS Grocery participated in trafficking as defined in

any of Section 271.2's six subsections. (A.R. 281.) Numan's affidavit also set out his defenses

to the four categories of trafficking listed in FNS' charge letter. (A.R. 281–83.) With respect to

the unusual number of transactions ending in the same cents value, Numan stated that it was the

store's practice to regularly round every customer's bill down to the nearest whole dollar amount

to establish goodwill.  (A.R. 282.)  With respect to the remaining three categories (the multiple

transactions from individual accounts in a short time frame, individual recipients exhausting their

allotment in unusually short periods of time, and the excessively large transactions), Numan

explained that his clients often live with large extended families so they must purchase groceries

in large quantities whenever they have a break from their low-paying jobs with odd hours that

hinder their ability to shop.  (A.R. 282–83.)

The remaining affidavits enclosed in Plaintiffs' response were from three SS Grocery

customers:  (1) Khandaker Nizum Uddin, (2) Kazal Ahmed, and (3) Suheb Chowdhury.  (A.R.

284–88.)  In addition to providing information on their respective family structures, all three

affiants stated that they only make trips to SS Grocery once or twice a month.  (*Id.*)  The affiants

also swore that, during their monthly trips, they did not observe Plaintiffs violate any law or

administrative regulation.  (*Id.*)

d.  <u>FNS' Decision to Permanently Disqualify Plaintiff</u>

Upon review of the relevant materials and Plaintiffs' submission, Program Specialist

Maureen Farley recommended that SS Grocery be permanently disqualified from SNAP.  (A.R.

289–304.)  She determined that neither the explanations in Numan's affidavit nor the accounts of

three SS Grocery customers adequately addressed any of the four categories of irregular

transactions.  (A.R. 290–304.)  Farley further noted that Numan "did not submit any

documentation stating that he was interested in requesting a [civil money penalty] for

trafficking"; therefore, she did not evaluate the possibility of the alternative sanction.  (A.R. 304.)

By letter dated May 4, 2016, Plaintiffs were informed that FNS found "that the violations

cited in [their] charge letter occurred at [SS Grocery]."  (A.R. 307.)  The letter further stated that

Plaintiffs were not eligible for a civil money penalty because they "failed to submit sufficient

evidence to demonstrate that [SS Grocery] had established and implemented an effective

6

compliance policy and program to prevent violations of the Supplemental Nutrition Assistance Program." (*Id.*) Thus, upon receipt of the letter, Plaintiffs were permanently disqualified from SNAP. (*Id.*)

### e. Administrative Appeal

By letter dated May 11, 2016, Plaintiffs, through their counsel, appealed the determination to the Chief of the Administrative Review Branch. (A.R. 360.) Along with their request, they attached the submission they had previously sent to FNS. (Def.'s Reply 56.1 ¶ 64.) On May 31, 2016, Plaintiffs submitted an additional letter to be considered on appeal. (*Id.* ¶ 66.) Upon review of the record, on June 20, 2016, the Administrative Review Officer Madeline Viens found that "[w]hile the charged owner was given the opportunity to explain and provide evidence of the legitimacy of the questionable transactions cited, in this case, the contentions do not outweigh the evidence in the record." (A.R. 372; Def.'s Reply 56.1 ¶ 67; Pls.' Reply 56.1 ¶ 28.) Further, the Administrative Review Branch found that Plaintiffs had not made the requisite showing to qualify for an alternative sanction. (A.R. 372.) Thus, the Administrative Review Branch sustained the decision to permanently disqualify Plaintiffs from participating in SNAP. (A.R. 373.)

### STANDARD OF REVIEW

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 330–31 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004). Where the non-movants bear

the burden of proof at trial, the movant's initial burden at summary judgment can be met by pointing to a lack of evidence supporting the non-movants' claim. *Celotex Corp.*, 477 U.S. at 325. Once the movant meets its initial burden, the non-movants may defeat summary judgment only by producing evidence of specific facts that raise a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Anderson*, 477 U.S. at 250; *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). The Court is to believe the evidence of the non-movants and draw all justifiable inferences in their favor, *Anderson*, 477 U.S. at 255, but the non-movants must still do more than merely assert conclusions that are unsupported by arguments or facts, *Castro v. Cty. of Nassau*, 739 F. Supp. 2d 153, 165 (E.D.N.Y. 2010) (citing *Bellsouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996)).

Where, as here, plaintiffs seek judicial review of an administrative decision, the district court must undertake the review *de novo*. 7 U.S.C. § 2023(a)(15) ("The suit in the United States district court or State court shall be a trial de novo by the court in which the court shall determine the validity of the questioned administrative action in issue."). In doing so, the district court "reexamine[s] the agency's decision on a fresh record, rather than determining whether the administrative decision was supported by substantial evidence." *Ibrahim v. U.S. Through Dep't of Agric.*, 834 F.2d 52, 52–53 (2d Cir. 1987). The court "must reach its own factual and legal conclusions based on the preponderance of the evidence, and should not limit its consideration to matters previously appraised in the administrative proceedings." *Id.* at 53–54 (quoting *Modica v. United States*, 518 F.2d 374, 376 (5th Cir. 1975)). "Plaintiffs, as the parties challenging their permanent disqualification from SNAP, bear the burden of proving by a preponderance of the evidence that the agency's action was 'invalid.'" *Arias v. United States*, No. 13-CV-8542, 2014 WL 5004409, at *6 (S.D.N.Y. Sept. 29, 2014) (quoting 7 U.S.C. § 2023(a)(16)). Because permanent disqualification is authorized for a singular instance of trafficking, a plaintiff's burden

encompasses "each cited instance of trafficking." *Duchimaza v. United States*, 211 F. Supp. 3d 421, 432 (D. Conn. 2016).

## DISCUSSION

### I.    FNS' Trafficking Finding Is Supported

Plaintiffs maintain that Defendant relied, in error, "solely upon EBT transaction reports and [drew] conclusions from those reports rather than conducting an investigation." (Plaintiffs' Memorandum of Law ("Pls.' MOL"), at 11, ECF No. 36-1.) Further, Plaintiffs urge the Court to find the EBT transaction reports inconclusive because Defendant did not rely upon an expert to determine that the reports were indicative of trafficking. (Plaintiffs' Motion for Summary Judgment, at 3–4, ECF No. 36.) In opposition, Defendant argues that the evidence overwhelmingly supports FNS' determination that SS Grocery engaged in the trafficking of SNAP benefits in violation of 7 C.F.R. § 271.2, such that Plaintiffs' motion should be denied and summary judgment should be entered in its favor. (Defendant's Memorandum of Law ("Def.'s MOL"), at 6, ECF No. 34-1.) Defendant is correct.

In determining whether a trafficking finding is appropriate, FNS is permitted to consider "facts established through on-site investigations, inconsistent redemption data, evidence obtained through a transaction report under an electronic benefit transfer system, or the disqualification of a firm from the Special Supplemental Nutrition Program for Women, Infants and Children." 7 C.F.R. § 278.6(a). Here, FNS had the benefit of reviewing SS Grocery's EBT transaction data from July 2015 to December 2015; an EBT recipient transaction analysis for several SS Grocery customers; EBT redemption data from comparable stores; notes and photographs from a contractor's August 2015 visit to SS Grocery; as well as notes and photographs from a contractor's visit to three comparable stores within the relevant period. A review of this

information warrants a finding that Plaintiffs engaged in all four forms of trafficking charged by FNS.

      a.   Unusual number of transactions ending in same cents value

FNS' analysis of the 6,975 EBT transactions occurring during the review period found that almost 69% of the transactions exceeding $50.00 ended in the same cents value. (A.R. 166.) That is, of the 1,373 transactions exceeding $50.00, 943 of them ended in zero cents. (A.R. 166, 233–50.) The 943 transactions accounted for $116,008.00 in SNAP benefits. (A.R. 250.)

The number of transactions ending in the same cents value is indicative of Plaintiffs' trafficking for at least three reasons. *First*, as identified in the site visit, SS Grocery sells meat and produce by the pound as opposed to by the package. (A.R. 166.) And, only one item on the price list ends in a zero cents value. (*Id.*) Thus, it is highly implausible that 943 transactions resulted in a total of zero cents. *Second*, of the same cents value transactions, fifty-two of them exceeded $250; several of them exceeded $500. (A.R. 167.) SS Grocery's layout and inventory do not appear to be able to sustain all fifty-two transactions. (A.R. 87, 90.) *Third*, of SS Grocery's EBT transactions of $50.00 or less, only 23% of them ended in a zero cents value. (A.R. 292.) This is a stark difference from the 69% of transactions ending in a zero cents value for purchases exceeding $50.00. For these reasons, the Court agrees with FNS' conclusion that the "disproportional amount of transactions that end in a same cent value" appear "contrived." (A.R. 166.)

      b.   Recipients making multiple transactions in unusually short time frames

FNS also identified 114 EBT transactions where single SNAP households made multiple withdrawals in a short period of time. (A.R. 168, 207.) Specifically, the charge letter details instances where beneficiaries made one redemption and then made another redemption within

twenty-four hours.  (A.R. 201–07.)  Such transactions accounted for $11,218.24 in SNAP

benefits.  (A.R. 207.)

Conspicuously, almost half of the transactions occurred within ten minutes of the initial

transaction.  (A.R. 201–07.)  For example, on July 6, 2015, a beneficiary redeemed $75 at 1:42

p.m., and then, less than nine minutes later, redeemed $600.  (A.R. 203.)  Another beneficiary, on

September 8, 2015, redeemed $375 and $28 (totaling $403) in seven minutes and twenty-five

seconds.  (*Id.*)  Additionally, on December 12, 2015, a beneficiary redeemed $210 at 1:19 p.m.,

and then, less than seven minutes later, redeemed $255.  (A.R. 202.)

The multiple transactions made in less than twenty-four hours, sometimes within minutes,

calls into serious question their legitimacy.  As Defendant posits, why would a beneficiary, who

has just purchased $210 worth of groceries purchase an additional $255 worth of groceries less

than seven minutes later?  (Def.'s MOL at 7–8.)  Similarly, is it probable that another beneficiary

purchased $75 worth of eligible items, only to purchase an additional $600 worth of eligible

items nine minutes later?  Additionally, it is undisputed that SS Grocery measures only 600

square feet and had no optical scanners for use at checkout during the review period.  (Def.'s

Reply 56.1 ¶¶ 27, 31.)  How could such a relatively small store process back-to-back large

transactions, without an optical scanner, in such a short period of time?  How could customers

make such back-to-back large transactions without the benefit of a shopping cart?

These questionable transactions support FNS' determination that SS Grocery was likely

employing an often-used method to avoid detection of trafficking:  conduct multiple small

transactions in a short period of time "to avoid single high dollar transactions that cannot be

supported."  (A.R. 168.)

     c.  <u>Recipients exhausting all or a majority of benefits in unusually short periods of time</u>

FNS identified 112 transactions, involving 64 households, where the majority or all of the household's SNAP benefits were exhausted within a short period of time.  (A.R. 258–66.)  Transactions in this category accounted for $17,303.13 in SNAP benefits.  (A.R. 266.)

According to the USDA Office of Research and Analysis' report, the average SNAP recipient gradually exhausts his or her benefits over the course of one month.  *See* Laura Castner and Juliette Henke, *Benefit Redemption Patterns in the Supplemental Nutrition Assistance Program*, U.S. Department of Agriculture, Food and Nutrition Service, Office of Research and Analysis, 11 (Feb. 2011), https://fns-prod.azureedge.net/sites/default/files/ARRASpendingPatterns.pdf.[2]  Per the report, households average 9.3 purchase transactions per month.  *Id.* at 11.  Most of the purchase transactions are under $25.  *Id.* at 12.  The report also includes data pertaining to the percentage of benefits the average beneficiary redeems over the course of one month.  On the day an issuance is distributed, the average household redeems 21.4% of its benefit.  *Id.* at 31.  By the first and second weeks, households have redeemed 58.7% and 78.9% of their monthly benefit, respectively.  *Id.* at 31–32.  An additional 18.4% is redeemed during the latter half of the month, which results in 2.7% of benefits remaining in the beneficiary's account at the end of the month.  *Id.* at 32.

In the instant action, all but three of the sixty-four households redeemed 100% or nearly 100% of their benefits within a span of ten minutes, either in a single transaction or multiple transactions.  (A.R. 258–66.)  This is a stark difference from the national average detailed above; and, an even starker difference from the New York average.  *See e.g.*, Castner and Henke, *Benefit Redemption Patterns in the Supplemental Nutrition Assistance Program*, at 42 (noting that on the

---

[2] This report was cited by Administrative Review Officer Viens.  (A.R. 368.)

day an issuance is distributed, the average New York household redeems only 15.9%). Moreover, as Defendant notes, redeeming all benefits in one day "is especially suspicious because while SS Grocery sells some non-perishable items, it sells assortments of fruit and meat, food that likely would spoil if purchased only once per month." (Def.'s MOL at 8.) Lastly, it is highly implausible that beneficiaries would choose to exhaust all of their benefits in one day at a small grocery store when there are larger stores nearby with a much wider selection of eligible items.

In the light of these irregularities, the Court agrees with FNS' determination that "[i]t is not plausible" that the households "would have depleted the majority or all of their SNAP benefits at SS Grocery" in one or two transactions; "[i]t is more plausible [that] these clients were trafficking at the store." (A.R. 170.)

d. Recipients making excessively large purchase transactions

FNS identified 275 purchase transactions that qualified as "excessively large." (A.R. 267–71.) All transactions included in the category are for $150 or more. (*Id.*) Excessively large transactions accounted for $61,653.56 in SNAP benefits. (A.R. 271.)

As previously discussed, SS Grocery is a small grocery store, measuring 600 square feet. (A.R. 164.) The site visit revealed, all items for purchase, excepting a few produce bins on the sidewalk, are located on the inside perimeter of store. (A.R. 90, 92, 96, 98–105.) There are no individual aisles. (*Id.*) Upon entering SS Grocery, the store's two cash registers are to the right. (A.R. 90.) There is approximately three feet by two feet of counter space between the registers. (A.R. 164.) During the review period, SS Grocery was not equipped with shopping carts, adding machines/calculators, or optical scanners. (*Id.*) It did, however, have ten or more shopping baskets for customers to use during their visit. (*Id.*)

Given SS Grocery's size, layout, lack of shopping carts, as well as lack of technology to quickly process large transactions, it is highly implausible that each and every one of the excessively large transactions took place. For example, on August 15, 2015, one beneficiary made a purchase totaling $1,000. (A.R. 171.) Another beneficiary, on November 15, 2015, redeemed $779 in SNAP benefits. (*Id.*) Additionally, on July 6, 2015, a beneficiary's total amounted to $600. (*Id.*) These three transactions and the other excessively large transactions are extremely suspicious. As an initial matter, it would be quite the task to carry around $1,000 worth of items without a shopping cart. Then, once the customer had managed to transport the items to a cash register, the limited counter space and lack of an optical scanner or calculator would make the checkout process even more impracticable.

Furthermore, as compared to other small grocery stores, the transactions are even more suspect. During the review period, the average transaction amount for small New York grocery stores, similarly situated to SS Grocery, was $11.39. (A.R. 171.) The average of the 275 purchase transactions is $224.19, which is 1,868.31% higher than the average purchase amount for small grocery stores in the surrounding New York area. Even expanding the scope to all 6,975 EBT transactions that were made during the review period, SS Grocery's average is still 201.23% higher than the average purchase amount for small grocery stores.

Accordingly, the Court agrees with FNS' determination that the 275 excessively large transactions are "very unusual," "highly unlikely," and "indicative of trafficking," in violation of 7 C.F.R. § 271.2. (A.R. 171.)

e. SS Grocery's redemptions exceeding comparable stores

In addition to the EBT transaction data, FNS examined the redemptions of and conducted site visits to comparable grocery stores. Specifically, FNS compared SS Grocery to Ittadi Bazaar LLC, Taj Grocery, and Rumali Bazaar Inc., which are all located within .15 miles of SS Grocery.

(A.R. 295.) During the review period, Ittadi Bazaar LLC, Taj Grocery, and Rumali Bazaar Inc. had total redemptions of $38,255.55, $29,098.26, and $34,344.77, respectively. (A.R. 296.) In contrast, SS Grocery had total redemptions of $239,326.73 during the review period. (*Id.*) SS Grocery's redemptions, which are six to eight times higher to these comparable stores, further support the finding that SS Grocery engaged in unlawful trafficking during the review period.

*          *          *

All of the foregoing evidence provides sufficient support for the determination that Plaintiffs engaged in trafficking as defined by § 217.2 of the SNAP regulations. Contrary to Plaintiffs' assertions, Defendant neither solely relied upon the EBT transaction reports, nor was it prohibited from doing so. The statue provides that the disqualification determination may include "facts established through on-site investigations, inconsistent redemption data, *or evidence obtained through a transaction report under an electronic benefit transfer system.*" 7 U.S.C.A. § 2021 (emphasis added); *see also Nadia Int'l Mkt. v. United States*, 689 F. App'x 30, 33 (2d Cir. 2017) (summary order) (explaining that "it was entirely proper for FNS to rely on transaction data alone in making its trafficking determination"); *Sky Grocery, LLC v. United States Dep't of Agric.-Food & Nutrition Serv.*, 15-CV-1082, 2017 WL 1054484, at *8 (D. Conn. Mar. 20, 2017) ("EBT transaction reports may provide sufficient circumstantial evidence of trafficking."). Accordingly, Defendant is entitled to summary judgment on whether the identified transactions, together with other evidence in the record, are indicative of trafficking.

## II.     Plaintiffs' Proffered Explanation Is Insufficient

Plaintiffs do not address their explanation for the transactions identified in the charge letter in the instant motion. However, in Plaintiffs' initial response to the charge letter, they presented two defenses vis-à-vis affidavits from Plaintiff Numan and three SS Grocery customers. *First*, Plaintiffs contended that, with respect to the transactions ending in the same

15

cents value, it was their usual practice to round down to the nearest dollar in order to establish and maintain goodwill with customers. (A.R. 282.) *Second*, with respect to transactions where beneficiaries made multiple transactions in a short period of time, exhausted benefits in a short period of time, or made excessively large purchases, Plaintiffs contended that their customers' low-paying, hourly jobs account for any perceived irregularities in the EBT transaction data. (A.R. 282–83.) Neither defense provides sufficient justification.

Plaintiffs' purported practice of rounding down to the nearest dollar is belied by the record. If indeed it was SS Grocery's practice to round down to the nearest dollar, the transaction reports should show a consistent amount of transactions ending in a zero cents value, regardless of the purchase amount. However, this is not the case. Purchase transactions amounting to $50 or more ended in a zero cents value 69% of the time; and, purchase transactions amounting to less than $50 ended in a zero cents value only 23% of the time. (A.R. 365.)

Moreover, the nature of Plaintiffs' customer's employment is entirely unrelated to or fails to adequately explain the remaining three patterns identified. With respect to transactions where beneficiaries made multiple transactions in a twenty-four hour period, the beneficiaries' inability to make multiple trips to the grocery store does not explain this phenomenon. In fact, the proffered explanation makes the multiple trips seem even more improbable. It is highly unlikely that beneficiaries with only a few hours to spare once a week have the capacity to go to the store multiple times in a twenty-four hour period. With respect to transactions where beneficiaries exhausted their benefits in a short period of time or made excessively large purchases, if the time period within which beneficiaries could shop was constrained, they would patronize a store that was equipped with technology and shopping carts as opposed to SS Grocery. SS Grocery is ill equipped to process large transactions in a short amount of time. As previously stated, SS

16

Grocery lacks shopping carts, optical scanners, and calculators. Moreover, there is little counter space to accommodate such large purchases.

The three affidavits from SS Grocery customers do not make up for the shortcomings of Plaintiff Numan's affidavit for the following reasons. *First*, the affiants do not attest to any facts that would explain the purported rounding practice or the need to make multiple purchases in a twenty-four hour period. Thus, the affidavits are not explicative of the first two patterns. *Second*, each affidavit is either deficient or implausible in its attempt to address the remaining patterns. With respect to Affiant Chowdhury, Plaintiffs failed to affirmatively connect him to any of the store's EBT transactions and FNS was unable to locate an exact match. (A.R. 303–04.) Affiant Uddin's affidavit is directly contradicted by the data associated with his benefit account. (A.R. 302.) And, Affiant Ahmed's affidavit fails to address any of the Court's suspicions identified above. Indeed, it adds to the Court's suspicions that Ms. Ahmed, an unemployed widow and single mother of three, travels 5.2 miles to SS Grocery and transports $511 worth of groceries home. *Third*, the affiants' assertion that they did not personally observe trafficking during any of their visits is not sufficient to overcome the significant amount of data obtained over the course of six months.

Accordingly, Plaintiffs have failed to present any arguments that sufficiently refute the trafficking charges against them.[3]

---

[3] Plaintiffs take exception to the fact that FNS did not provide the names and addresses of the purported traffickers— thus preventing Plaintiffs from adequately refuting the allegations—without identifying any statutory or legal authority to support their objection. (Pls.' MOL at 3–4.) However, assuming *arguendo* that the initial instance constituted an error, it was remedied when Defendant provided them with the requisite information to subpoena the names and addresses of the customers, but Plaintiffs opted not to do so. (Def.'s MOL at 6 n.3.); *see also Ibrahim*, 834 F.2d at 53–54 (noting that district courts "should not limit [their] consideration to matters previously appraised in the administrative proceedings") (quoting *Modica*, 518 F.2d at 376).

**III.    The Permanent Disqualification of Plaintiffs Is Not an Abuse of Discretion**

Having determined that Plaintiffs failed to rebut the well-supported finding that the evidence in the record is indicative of trafficking, the Court turns to Plaintiffs' argument that the permanent disqualification of SS Grocery was arbitrary and capricious as a matter of law.  (Pls.' MOL at 13.)

A federal court's determination of whether the imposition of a penalty is arbitrary or capricious is a matter of law that is properly decided on a motion for summary judgment.  *El Tepeyac Grocery Inc. v. United States*, 11-CV-5837, 2012 WL 1227956, at *2 (S.D.N.Y. Apr. 10, 2012), *aff'd*, 515 F. App'x 55 (2d Cir. 2013) ("Whether the imposition of a penalty by the FNS [is] arbitrary or capricious is a matter of law appropriately determined on a motion for summary judgment.") (quoting *Yafaie v. United States*, 94-CV-7825, 1995 WL 422169, at *1 (S.D.N.Y. July 18, 1995)).  "The standard of review for the imposition of a [SNAP] sanction . . . is a determination [of] whether [FNS's] action was arbitrary or capricious, *i.e.*, whether it was unwarranted in law or without justification in fact."  *Kawran Bazar Inc. v. United States*, 15-CV-6109, 2016 WL 7235723, at *3 (E.D.N.Y. Dec. 13, 2016), *aff'd*, 721 F. App'x 7 (2d Cir. 2017) (quoting *El Tepeyac Grocery, Inc.*, 515 Fed. App'x at 56).  If the penalty imposed by FNS is in accord with its own guidelines, district courts may not deem the underlying decision arbitrary and capricious.  *See 183 Bronx Deli Grocery Corp. v. United States*, 11-CV-1527, 2012 WL 2359664, at *4 (S.D.N.Y. June 18, 2012) ("Courts in this District have repeatedly held that, '[i]f the agency has followed its guidelines,' 'the reviewing court may not overturn the decision as arbitrary and capricious.'") (quoting *Lugo v. United States*, 8-CV-2960, 2009 WL 928136, at *2 (S.D.N.Y. Mar. 30, 2009)).

Here, as Defendant notes, the permanent disqualification of Plaintiffs from the SNAP program "was justified by statute."  (Def.'s MOL at 15.)  Pursuant to 7 C.F.R. § 278.6(e)(1)(i),

18

FNS shall permanently disqualify any grocery store that is found to have engaged in trafficking as defined in 7 C.F.R. § 271.2. Thus, upon the finding that Plaintiffs engaged in trafficking, FNS was mandated by statute to permanently disqualify Plaintiffs from the program. FNS was not permitted to consider any other penalty unless SS Grocery requested that FNS consider a civil money penalty and supported its request with the requisite evidence. *See* 7 C.F.R. § 278.6(i). Plaintiffs made no such request to either FNS or the Court. Therefore, as a matter of law, FNS' decision cannot be deemed arbitrary or capricious.

## IV.     Plaintiffs' Due Process Rights Were Not Violated

Plaintiffs argue that their due process rights were violated in two ways. *First*, they maintain that their rights were violated by the Administrative Review Officer's denial of Plaintiffs' right to a "fair hearing." (Pls.' MOL at 12.) *Second*, Plaintiffs maintain that, on appeal, FNS failed to apply the summary judgment standard that governs in a federal court. (*Id.*)

Plaintiffs' due process claim is without merit for several reasons. But, most obviously, Plaintiffs' procedural due process rights are not infringed upon because "[t]he trial de novo provision clearly afford[s] full procedural due process." *Ibrahim*, 834 F.2d at 54 (citing case standing for the proposition that, "[b]y providing the aggrieved food store with a new trial where the store may introduce evidence outside the administrative record, the statute also protects the rights and interests of the store against final adverse action without the opportunity for an adversary hearing"); *see also Nagi v. U.S. Dep't of Agr.*, 96-CV-6034, 1997 WL 252034, at *3 (S.D.N.Y. May 14, 1997) ("Plaintiff's procedural due process claim is without merit because plaintiff was afforded agency review and is being given *de novo* review by this Court."). Moreover, to the extent that Plaintiffs are alleging a violation of their substantive due process right, this claim, too, fails. As explained in *Nagi*, FNS' policy that permits SS Grocery's disqualification is reviewed under a rational basis test, which requires only that the policy "is

19

rationally related to a legitimate government purpose." *Id.* at *3. SNAP's purpose is to "alleviate

hunger and malnutrition." *Id.* Thus, the prevention of illegal transactions is rationally related to a

legitimate government purpose. *Id.*

## CONCLUSION

Based on the foregoing, Plaintiffs' motion for summary judgment is denied; and,

Defendant's cross-motion for summary judgment is granted. Plaintiffs' claims are dismissed in

their entirety. The Clerk of Court is respectfully requested to enter judgment in favor of

Defendant and close this case.

Dated:  Brooklyn, New York
        September 11, 2018

                            SO ORDERED:

                                 /LDH
                            LaSHANN DeARCY HALL
                            United States District Judge